FILED

IN THE UNITED STATES DISTRICT COURT UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO ALBUQUERQUE, NEW MEXICO

JUN 3 0 2006

**LELAND TAYLOR,**
Mineral Claimant,
Comtempnor,

MATTHEW J. DYKMAN
CLERK

Plaintiff,

vs.                                                   No. **CIV 04-0473 MCA/RLP**

**UNITED STATES DEPARTMENT OF
INTERIOR BUREAU OF LAND
MANAGEMENT and DOUG BLAND OR
BILL BRANCARD IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITY
AS DIRECTORS OF NEW MEXICO
MINING AND MINERALS DIV. NEW
MEXICO ENERGY, MINERALS AND
NATURAL RESOURCES DEPT.,**

Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *State Defendants' Motion to Dismiss
with Prejudice Plaintiff's Final Amended Complaint for Declaratory Judgment, Appeal from
the IBLA, Petition for Habeas Corpus and Other Claims* [Doc. 42], filed May 6, 2005;
*United States' Motion to Dismiss Plaintiff's Final Amended Complaint Due to Lack of
Subject Matter Jurisdiction* [Doc. 46], filed May 17, 2005; and Plaintiff's *Motion to Take
Leave to File Amendment to Complaint* [Doc. 63], filed October 12, 2005. Having
considered the parties' submissions, the relevant law, and otherwise being fully advised in



the premises, the Court grants the *State Defendants' Motion to Dismiss with Prejudice Plaintiff's Final Amended Complaint for Declaratory Judgment, Appeal from the IBLA, Petition for Habeas Corpus and Other Claims*; denies the *United States' Motion to Dismiss Plaintiff's Final Amended Complaint Due to Lack of Subject Matter Jurisdiction*; and denies Plaintiff's *Motion to Take Leave to File Amendment to Complaint.*

## I. BACKGROUND

### A. Factual History

*Pro se* Plaintiff Leland Taylor is a self-described mineral claimant under the Mining Law of 1872, 30 U.S.C. §§ 1 *et seq.*, with an interest in certain mining and mineral claims or potential mineral claims within the state of New Mexico. Defendants are the United States through the Bureau of Land Management ("BLM"), an agency of the United States Department of the Interior ("DOI") responsible for implementing federal mining laws, and Doug Bland and Bill Brancard ("State Defendants"), individually and in their official capacities as Directors of the New Mexico Mining and Minerals Division of the New Mexico Energy, Minerals and Natural Resources Department ("MMD").   [Doc. 41 at 2]. The instant dispute centers on the mineral humate, a carbonaceous mudstone or shale-like material made of decomposed humus and salts of humic acids,[1] and its classification as a

---

[1] More specifically, humates are the salts of humic acids and come from the remains of plant and animal life that accumulated in a vast freshwater sea in the western United States. Over millions of years, humate was compressed and converted from a peaty mass into nature's most concentrated source of vital humic acids. Humic acids are most responsive in high carbohydrate crops like potato, sugar beet, tomato, carrot, fruits of all types, barley, maize, wheat, rice, and to a lesser extent beans, oil crops and fiber crops.  Robert H. Faust, *What Are Humates and What Do They Do for You?*

salable (reserved to the United States) or locatable (capable of being staked and patented by a claimant) mineral.

The facts of this case are relatively straightforward and, as recited herein, are taken from Taylor's *Final Amended Complaint for Declaratory Judgment, Appeal from the IBLA, Petition for Writ of Habeous* [sic] *Corpus, and Other Claims* ("*Final Amended Complaint*"). [Doc. 41].[2] In 1976, Leland B. Taylor, Plaintiff's father, doing business as Farm Guard Products, entered into a duration-of-product contract ("DOPC") with the BLM to mine humate at the Clod Buster mine site near Cuba, New Mexico. Taylor's company, Agronics, Inc., succeeded to the DOPC and mined humate at the Clod Buster site until 1992, when the DOPC was canceled for failure to remit to the BLM an annual payment of $15,000. On May 29, 2003, Taylor and others filed a notice of discovery by location of approximately 160 acres of placer mining land on the Clod Buster site. Agronics continued to extract humate

---

(1998), at http://www.humate.net. Humate is used chiefly to alter the chemical character of soil by improving plant uptake of nutrients via the humic and other acids present in the humate. Maurice Tanner, 141 IBLA 373, 382 (1997).

    [2] As discussed in greater detail in I.A., Taylor was directed by this Court's April 8, 2005 *Order* to file one consolidated final complaint in which he was to include all claims for relief and name all parties from whom he sought such relief. [See Doc. 40]. Taylor thereafter filed his *Final Amended Complaint*. [Doc. 41]. Taylor, however, failed to attach exhibits to the *Final Amended Complaint* and, instead, referred therein to the exhibits attached to his earlier, but stricken, *Complaints*. Even though Taylor was specifically and expressly instructed to include in the *Final Amended Complaint* "all claims and all causes of action as he may have against any named Defendant [and to] state with particularity each and every claim and . . . conform to and comply with all applicable Rules of Civil Procedure and local rules of practice of this Court[,]" [Doc. 40], the Court notes Taylor's *pro se* status and consequently considers herein the exhibits attached to the earlier *Complaints* as if they also were attached to the *Final Amended Complaint*. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

-3-

from the Clod Buster site between the cancellation of the DOPC and the filing of the notice of discovery by location.  The BLM considered all extractions by Agronics during this period to constitute trespass.  [Doc. 41 at 4-5].

On October 25, 1994, Agronics filed for relief under Chapter 11 of the Bankruptcy Code.  On December 9, 1994, the BLM filed a proof of claim for damages resulting from Agronics's alleged trespass following cancellation of the DOPC.  [Doc. 41 at 5-6; see also Doc. 1, Exh. 11].  On October 17, 1995, with knowledge that Agronics had sought relief in bankruptcy, the BLM declared Agronics's mining claims abandoned and void for failure to pay its annual maintenance fee.  [Doc. 41 at 6].  On March 25, 1997, the Bankruptcy Court filed *Findings of Fact and Conclusions of Law.*  [See Oct. 25, 2005 letter to the Court with attached *Findings of Fact and Conclusions of Law* of Bankruptcy Court, hereinafter "Bankruptcy Court's Findings and Conclusions"].

The Bankruptcy Court's Findings and Conclusions were very specific to Agronics and the Clod Buster site and included the following:

> Pursuant to a mineral sale contract, Agronics mined humate at the Clod Buster site from 1976 until 1992, when the contract was canceled by the BLM;
>
> Despite the cancellation of the contract, Agronics continued to mine humate from Clod Buster;
>
> The BLM considered Agronics's extractions to constitute trespass;
>
> On October 25, 1994, Agronics filed for relief under Chapter 11 of the Bankruptcy Code.

-4-

On December 9, 1994, the BLM filed a proof of claim for $136,392 (later amended to $22,893) for damages resulting from the alleged trespass;

On October 17, 1995, the New Mexico office of the BLM issued a decision declaring Agronics's mining claims to be abandoned and void;

A letter to Agronics announcing the BLM's decision explained that Agronics's annual maintenance fee of $100 per claim, which was due on or before August 31, 1995 was not received until September 6, 1995. The BLM's decision to declare the mines abandoned and void was based on 43 CFR 3833.1-5, which provides that failure to conform to the requirements of the regulation constitutes a forfeiture of the mining claim;

At the time the BLM declared Agronics's mines abandoned and void, it had notice that Agronics had filed a petition in bankruptcy;

Humate is a naturally formed carbonaceous substance having a limited but definable range of chemical composition;

The Clod Buster mine is located in the Upper Cretaceous system of the Menefee Formation. The humate deposit is composed of black-brown laminated carbonaceous shaley siltstone with plant fragments and/or powdery black shale;

Humate is considered a mineral by the U.S. Geological survey;

Humate is not created *de novo* by organisms but results from decomposition of such organisms or natural derivation from carbonaceous substances of whatever origin;

The composition of the humate at the Clod Buster site has a low pH and an inherent chemical activity when applied to soil. The low pH and the chemical activity of humate changes the chemistry of the soil in such a way as to promote plant growth, root growth, and growth of certain soil microorganisms;

-5-

Humate from the Clod Buster site is a valuable mineral;

The humate deposit at the Clod Buster site satisfies the statutory and common law requirements for locatability;

Because humate is locatable, Agronics's removal of humate from the Clod Buster site between August 1992 and May 1993 did not constitute trespass.  The BLM's claim for trespass, therefore, should be disallowed;

The BLM's action in declaring the Clod Buster mines to be abandoned and void was in violation of § 362(a)(3) of the Bankruptcy Code[3], which provides that the automatic stay bars any act to obtain possession of or to exercise control of property of the estate;

The BLM's actions did not come within an exception to the automatic stay allowing the government to avoid restrictions when necessary to protect health and safety, because the BLM's declared the Clod Buster mines abandoned and void in conjunction with its own pecuniary interest.

Agronics's motion to declare the action of the BLM void should be granted and those Clod Buster mines that were declared abandoned and void should be reinstated.

Bankruptcy Court's Findings and Conclusions at 2-10.

_____

[3]  Section 362(a)(3) of Chapter 11 of the Bankruptcy Code operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"11 U.S.C. § 362(a)(3).  The Tenth Circuit has described the automatic stay as "'provid[ing] for a broad stay of litigation, lien enforcement, and other actions, judicial or otherwise, which would affect or interfere with property of the estate, property of the debtor, or property in the custody of the estate.'" Sec. Investor Protection Corp. v. Blinder, Robinson & Co., Inc., 962 F.2d 960, 965 (10th Cir. 1992) (*quoting* 2 COLLIER ON BANKRUPTCY ¶ 362.01, at 362-8 to-9 (15th ed. 1992))

Contemporaneously with its Findings and Conclusions, the Bankruptcy Court entered its *Order Declaring an Action of the Bureau of Land Management Void and Reinstating Mining Claims.* [Doc. 1; Exh. 11]. That *Order* stated:

> IN ACCORDANCE with the Findings of Fact and Conclusions of Law entered herewith, the Court FINDS the action taken by the Bureau of Land Management in declaring the debtor's mining claims to be abandoned and void was in violation of § 362(a)(3) of the Bankruptcy Code and should be and HEREBY IS DECLARED VOID, and the Bureau of Land Management is directed to reinstate said claims.

[Id.]. On April 28, 1997, the United States perfected an appeal from the Bankruptcy Court's Order. [See Doc. 1 in Case No. 97-590 JP/JHG].

The District Court determined that "[the United States's] objections appear[ed] to be without merit[,]" but concluded that, before making a final decision, the case should be remanded to the Bankruptcy Court for additional findings on the issue of jurisdiction and standing. Accordingly, the matter was remanded for supplemental findings and conclusions of law on the following issues:

> Agronics's standing to raise the issue of locatability before the Bankruptcy Judge as a defense to the BLM's proof of claim for trespass, and

> The Bankruptcy Court's jurisdiction under 11 U.S.C. § 157 to hear issues regarding the BLM's trespass and abandonment claims.

[Doc. 19 in Case No. 97-590 JP/JHG].

By Order entered April 17, 2000, the District Court, having made a *de novo* review of the Bankruptcy Court's *Findings of Fact and Conclusions of Law*, as well as its *Supplemental Findings of Fact and Conclusions of Law* affirmed the Bankruptcy Court's *Order Declaring an Action of the Bureau of Land Management Void and Reinstating Mining Claims*, affirmed the Bankruptcy Court's *Order Sustaining Debtor's Objection to the Claim of the Bureau of Land Management*, and dismissed the United States's appeal. [4] [Doc. 21 in Case No. 97-590 JP/JHG].

On May 27, 1999, while the appeal from the Bankruptcy Court proceedings was pending, the Department of the Interior enacted Public Land Order 7392, which provided, in pertinent part, that, subject to valid existing rights, certain public lands were being withdrawn from settlement, sale, location, or entry under the general land laws, including the United States mining laws, to protect an area having potential for development of humate from encumbrances due to mining claim location. 64 FR 28832-01 (1999). The cited authority for this withdrawal was the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714 (1994), which authorizes the Secretary of the Interior to make, modify, extend, or revoke land withdrawals. See 43 U.S.C. § 1714(a).

Thereafter, on June 16, 2003, four years after enactment of Public Land Order 7392, Taylor filed notices of intent to locate ("NOITLs") humate on privately owned surface lands

---

[4] For ease of reference, complete copies of the Bankruptcy Court's Findings of Fact and Conclusions of Law, filed March 25, 1997; the Bankruptcy Court's Supplemental Findings of Fact and Conclusions of Law, filed June 26, 1998; and District Judge Parker's Order, filed April 17, 2000, are attached to this *Memorandum Opinion and Order*.

that are separate from the Clod Buster site. The BLM rejected those notices on the ground that those lands had been withdrawn by Public Land Order 7392. [Doc. 41 at 9; see also Doc. 1, Exh. 20]. Taylor appealed this rejection to the Office of Hearings and Appeals of the Interior Board of Land Appeals ("IBLA"), but his appeal was dismissed. Taylor sought reconsideration, and on October 29, 2004, the IBLA affirmed the dismissal, explaining that the NOITL lands had been withdrawn several years earlier and, therefore, were not available for mineral entry on June 16, 2003. [See Doc. 19, Exh. 22]. According to Taylor, the land withdrawal was effected for the sole purpose of allowing the BLM to sell humate, which is prohibited, as humate is a locatable mineral. [Id. at 9].

Taylor submits that, in its *Order* of March 25, 1997, the bankruptcy court specifically found that humate is a locatable mineral. [Doc. 41 at 10]. It is Taylor's position that once a mineral is deemed locatable it is locatable everywhere. According to Taylor, therefore, the BLM's refusal to recognize humate as locatable, and the State Defendants' (through the actions of Bland and Brancard) rejection of his mining-permit applications on the basis of their reliance on the BLM's wrongful classification of humate as salable, are in direct contradiction to the decision of the bankruptcy court, as affirmed by the district court. [Id. at 9-10].

The United States disagrees with the bankruptcy court's finding that humate is locatable. At a hearing held October 7, 2005 in this matter, William Dalness, a geologist with the BLM, testified that the BLM takes the position that the bankruptcy ruling applies

to Taylor's Clod Buster claims only, since a mining claim moving through a bankruptcy proceeding represents an "unusual aberration" and a "unique situation." [Testimony of William Dalness, Oct. 7, 2005]. Dalness additionally testified that "never in [his] knowledge ha[d] the mining law matters gone through bankruptcy court" and, further, that "[BLM] understand[s] the secretary of interior makes decisions on such matters through the interior board of land appeals." [Id.]. Moreover, in a file memorandum[5] Dalness repeated that the bankruptcy court's decision regarding the locatability of humate "was in error, exceeded its jurisdiction, is limited to that case, and is not precedential in this or another other [sic] humate case." [Doc. 1; Exh. 13 at 1]. Dalness then explained that

> [t]he Bureau's position is that because the decision of the Bankruptcy Court as to the locatability of humate is not that of the Department of Interior or the result of an appeal of a decision of the Department of Interior, humate is regarded as a salable mineral consistent with long term Bureau policy.

[Id.].

## B. Procedural History

In contrast to the relative straightforwardness of the facts giving rise to the instant dispute, the procedural history of this case in this Court might generously be described as convoluted. Taylor initiated litigation by filing a *Complaint for Declartory* [sic] *Judgement* [sic]. [Doc. 1]. Following Defendants' filings of motions to dismiss, [see Docs. 9, 10],

---

[5] That memorandum was written in response to an appeal to the IBLA that Taylor perfected after the rejection of his attempt to locate humate on a site separate from both the Clod Buster site and the NOITL lands. This third site was the home of what is referred to as the "Revenge" claims and is discussed more fully below.

Taylor filed his first *Motion for Restraining Order.* [Doc. 11]. On November 5, 2004, this Court held a hearing on that motion and the motion was denied. [Docs. 21, 22]. Also on November 5, 2004, Taylor filed a document captioned *Plaintiff's First Amended Complaint for Declaratory Judgment Notice of Appeal from the IBLA.* [Doc. 19]. The *First Amended Complaint* did not appear to assert claims against any state defendants. [See generally id.]. Without seeking, much less obtaining, leave of Court or written consent of Defendants, Taylor, on December 3, 2004, filed his *Second Amended Complaint for Declaratory Judgment Notice of Appeal from the IBLA.*[6] [Doc. 23]. The *Second Amended Complaint* asserted claims against the State Defendants. [Id. at 2, 11-14]. Again, Defendants moved to dismiss. [See Docs. 25, 26].

On February 10, 2005, again without seeking leave of Court or Defendants' consent, Taylor filed his *Third Amended Complaint for Declaratory Judgment and Appeal from the IBLA,* which appeared to differ from the *First* and *Second Amended Complaints* only inasmuch as it added Director Brancard as a Defendant. [Compare Doc. 31 at 2 and Docs. 19, 23]. Having determined that only the *First Amended Complaint* was properly before it, this Court, by *Order* filed March 22, 2005, directed Taylor to show cause in person why the *Second* and *Third Amended Complaints* should not be stricken. [Doc. 36]. A hearing on the show-cause order was set for April 6, 2005, with notice being sent to counsel for

---

[6] Rule 15 of the Federal Rules of Civil Procedures allows a party to amend a pleading once as a matter of course at any time before a responsive pleading is served. Otherwise, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party[.]" Fed.R.Civ.P. 15(a).

-11-

Defendants and to Taylor on March 22, 2005. [See Doc. 35 ("A true copy of this notice was served – via mail or electronic means – to counsel of record as they are shown on the Court's Docket.")]. While counsel for Defendants appeared at the April 6 hearing, Taylor was not present.[7] [See Doc. 39]. Emphasizing Taylor's *pro se* status, the Court proposed striking the *Second* and *Third Amended Complaints* and allowing Taylor the opportunity to file one last, consolidated, amended complaint. Counsel for Defendants expressed no objection to the Court's proposal. [See Doc. 39].

On April 22, 2005, Taylor filed his *Final Amended Complaint* in which he seeks, among other things, to appeal from the October 29, 2004 IBLA decision affirming the BLM's rejection of the NOITLs he filed on June 20, 2003. [See Doc. 41 at 15-16]. Although the *Final Amended Complaint* names as a party "Doug Bland or Bill Brancard acting in their official and individual capacity as Directors hereinafter 'Directors' of the New Mexico Mining and Minerals Division of the New Mexico Energy, Minerals and Natural Resources Department[,]" the actual state agency is not named as a party to this action. [See id. at 2-3]. In any event, on May 5, 2005 and May 17, 2005, State Defendants and the United States, respectively, moved to dismiss. [See Docs. 42, 46]. On October 12, 2005, Taylor filed a *Motion to Take Leave to File Amendment to Complaint* in which he seeks to

---

[7] On or about April 19, 2005, Taylor wrote a letter to the Court, on which he copied counsel for Defendants, apologizing for having missed the April 6 hearing but explaining that he neither received notice of the hearing nor was otherwise made aware of it. In an effort to prevent similar future miscommunications, Taylor submitted with this letter an application to open an ACE (electronic filing) account.

appeal from a July 26, 2005 IBLA decision affirming the BLM's rejection of his attempt to

locate placer mining claims on previously withdrawn lands ("the Revenge claims"). The

United States opposes Taylor's attempt to amend the *Final Amended Complaint*, arguing

that, because there is no jurisdictional basis for the *Final Amended Complaint*, there is

nothing to be amended. [Doc. 66].

## II. ANALYSIS

### A. Subject Matter Jurisdiction

The United States has moved to dismiss Taylor's *Final Amended Complaint* for lack

of subject matter jurisdiction, arguing that Taylor may only appeal from the IBLA's October

29, 2004 final decision in a civil action brought pursuant to the Administrative Procedure

Act ("APA"). The motion to dismiss is also premised on the fact that the October 29, 2004

decision does not involve the Clod Buster site, which is the site identified in the *Final*

*Amended Complaint*. [Doc. 46 at 1]. The Court has carefully reviewed the *Final Amended*

*Complaint*, however, and is not convinced that Taylor is challenging any actions taken or

decisions made by the United States[8] pertaining to the Clod Buster site. Indeed, it is the

Clod Buster site that is the subject of the bankruptcy court's finding that humate is locatable.

Accordingly, to the extent the *Final Amended Complaint* mentions the Clod Buster site, the

Court construes that pleading as using Clod Buster (and the bankruptcy court's decisions

pertaining to it) as a springboard from which to attack the validity of the United States's

---

[8] By contrast, the Clod Buster site is the subject of Taylor's allegations of misconduct and
inaction against the State Defendants.

refusal to allow Taylor to locate claims on separate sites. Having thus determined that Taylor is not challenging determinations made regarding the Clod Buster site, the Court focuses on the United States's position that Taylor must pursue any appeal of the October 29, 2004 decision of the IBLA in an action pursuant to the APA.

Section 704 of the APA provides, in pertinent part, that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Taylor has specifically identified the APA as providing a statutory basis for challenging the decision of the IBLA.[9] Accordingly, the IBLA's decision is reviewable by this Court so long as it constitutes a final agency action. See Pennaco Energy, Inc. v. United States Dep't of Interior, 377 F.3d 1147, 1155 (10th Cir. 2004). The United States does not dispute that the October 29, 2004 decision of the IBLA is a final agency decision. [See Doc. 46 at 1]. The Court agrees that the IBLA's decision constitutes final agency action for purposes of the APA, since it is not tentative or interlocutory in nature and, instead, both "marks the "consummation" of the agency's decisionmaking process . . . [and is a decision] by which rights or obligations have been determined, or from which legal consequences will flow . . . ." Bennett v. Spear, 520

---

[9] Taylor also has identified 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as providing statutory bases for jurisdiction. The Declaratory Judgment Act, however, is not jurisdictional. Roberts v. Morton, 389 F.Supp. 87, 89 (D. Colo. 1975). Additionally, because Taylor is proceeding *pro se*, the Court, while cognizant of the rule holding that a party may not confer subject matter jurisdiction upon a federal court, see Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994), nonetheless construes Taylor's pleadings more liberally than it would those drafted by an attorney. See Haines, 404 U.S. at 520-21.

U.S. 154, 178 (1997). Accordingly, the United States's motion to dismiss for lack of subject matter jurisdiction will be denied.

"When an interested person objects to agency action made during an informal adjudication (one not conducted on the record after the opportunity for an agency hearing), the agency action is typically reviewed under an 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' standard." Southern Utah Wilderness Alliance v. Bureau of Land Mgmt, 147 F.Supp.2d 1130, 1134 (D. Utah 2001) (quoting Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir.1997)).  Under the arbitrary and capricious standard, the Court determines whether the agency considered all relevant factors and whether there has been a clear error of judgment. Pennaco Energy, Inc., 377 F.3d at 1156. "In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record." Id. (quoting Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir.1994)). Thus, agency action, whether it is classified as "formal" or "informal," will be set aside as arbitrary unless it is supported by "substantial evidence" in the administrative record. Olenhouse, 42 F.3d at 1575.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pennaco Energy, Inc., 377 F.3d at 1156 (quoting Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir.2003)). The term "substantial evidence" means something more than a mere scintilla but something less than the weight of the

evidence. Foust v. Lujan, 942 F.2d 712, 714 (10th Cir.1991). In other words, the inquiry

under the "substantial evidence" test is whether the agency's decision is based on such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Id. (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)).

### B. The Decisions of the IBLA

#### 1. The October 29, 2004 Decision of the IBLA

In a decision dated June 24, 2003, the BLM rejected NOITLs submitted by Taylor

on June 16, 2003 on the ground that the NOITLs concerned land (Stock Raising Homestead

Patent No. 1066654) that had been withdrawn by Public Land Order 7392.  The BLM

explained that "[t]his order withdrew public lands and federally·reserved mineral interest

underlying private surface estate from entry under the mining law for a period of 20 years."

[Taylor's Exh. 20].

On October 29, 2004, the IBLA affirmed the decision of the BLM.  [Doc. 19; Exh.

22 at 1].  The IBLA explained that

> [s]ince October 13, 1993, lands patented under the Stockraising
> Homestead Act of 1916, as amended, 43 U.S.C. § 299(b)(1)(A)
> (2000) cannot be entered for the purpose of locating mining
> claims on reserved federal minerals until a potential claimant
> has filed a notice of intent to locate with the BLM.  43 CFR
> 3833.1-2(c)(1).  On June 20, 2003, Taylor filed his Notice of
> Intent, indicating his intent to locate claims on the Subject
> Lands.  However, four years earlier, BLM had published Public
> Land Order No. 7392 withdrawing those and other lands from
> "settlement, sale, location, or entry under the general land laws,
> including the United States mining laws" for a period of twenty
> years.  64 FRD 28832 (May 27, 1999).  Accordingly, the lands

-16-

> covered by Taylor's Notice of Intent were not available for
> mineral entry. "[T]he proper action to take when the mineral
> estate covered by a notice of intent to locate is unavailable for
> mineral entry is to reject the notice." National Cement
> Company of California, 156 IBLA 131, 135 (2001). BLM's
> rejection of Taylor's Notice of Intent was proper.

[Id.].

Section 299 of Title 43 of the United States Code provides that no person other than

the surface owner may enter lands to locate a mining claim without first having filed a notice

of intention to locate. See 43 U.S.C. § 299(b)(1)(A)(i). Prior to the filing of Taylor's

NOITLs, however, the BLM had published Public Land Order 7392, which withdrew

certain lands, including those identified by Taylor in his NOITLs, "from settlement, sale,

location, or entry under the general land laws, including the United States mining laws . . ..

but not from leasing under the mineral leasing laws, to protect an area having potential for

development of humate (a carbonaceous shale) from encumbrances due to mining claim

location . . . ." 64 FR 28832-01. As authority for this action the IBLA cited the Federal

Land Policy and Management Act of 1976, 43 U.S.C. 1714 (1994), which authorizes the

Secretary of the Interior to make, modify, extend, or revoke land withdrawals. See 43

U.S.C. § 1714(a).

Taylor argues that the NOITL lands were improperly withdrawn given the

determination of the Bankruptcy Court that humate is a locatable mineral. Because the lands

were improperly withdrawn, continues Taylor, the IBLA's decision is arbitrary and

capricious. [Doc. 41 at 16]. To the extent that he is seeking to use the Bankruptcy Court's

Findings and Conclusions to prevent the rejection of his NOITLs or other claims to mine humate, the Court construes Taylor's action as an attempt to invoke either the doctrine of claim preclusion or issue preclusion, or both.[10]

"The doctrine of res judicata, or claim preclusion, will prevent a party from relitigating a legal claim that was or could have been the subject of a previously issued final judgment." MACTEC, Inc. v. Gorelick, 427 F.3d 821, 831 (10th Cir. 2005). Claim preclusion applies when there exists (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits. Id. When these three requirements are satisfied, the doctrine of res judicata is applicable unless the party seeking to avoid preclusion did not have a "full and fair opportunity" to litigate the claim in the prior suit. Id. (quoting Yapp v. Excel Corp., 186 F.3d 1222, 1226 n. 4 (10th Cir.1999)).

In the instant case, the Bankruptcy Court's Findings and Conclusions could not properly have been afforded preclusive effect by the IBLA because the element of cause-of-action identity was missing. To determine what constitutes a "cause of action" for preclusion purposes, the Tenth Circuit has adopted the "transactional approach" found in the

---

[10] For example, Taylor requests as relief that the Court declare that (1) "BLM and [State Defendants] are bound by the decision of the Bankruptcy Court and District Court that humate is [a] locatable mineral . . . ," (2) "BLM improperly withdrew certain lands for the purpose of selling humate as a salable mineral after it was on notice of the Bankruptcy Court's decision that humate is a locatable mineral." Taylor further asserts that "[t]he [NOITL] lands were improperly withdrawn . . . after the ruling of the New Mexico Bankruptcy Court, and ultimately, this District Court that humate was a locatable mineral." [Doc. 41 at 14-16].

Restatement (Second) of Judgments § 24.[11] Petromanagement Corp. v. Acme-Thomas Joint Venture, 835 F.2d 1329, 1335 (10th Cir.1988). Under this approach, a cause of action includes all claims or legal theories of recovery that arise from the same transaction. In this case, there is no identical cause of action because the claims before the Bankruptcy Court involved the Clod Buster site and the characteristics of the humate located thereon,[12] while the October 29, 2004 decision of the IBLA involved Taylor's entitlement to locate claims on withdrawn lands that Taylor has acknowledged are "separate from the Clod Buster minesite." [Doc: 41 at 9].

---

[11] Section 24 provides:

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1982).

[12] See Bankruptcy Court's Findings and Conclusions at 8 (specifically concluding that "[t]he humate deposit at the Clod Buster mine satisfies the statutory and common law requirements for locatability."). It is also important to note that the Bankruptcy Court's findings and conclusions were made in the context of determining whether the BLM's actions with respect to Clod Buster had been taken in violation of the automatic stay.

Nor does the doctrine of issue preclusion, or collateral estoppel, apply here. Whereas the doctrine of res judicata involves a *claim*, the doctrine of issue  preclusion holds that when an *issue* of ultimate fact has been once determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003).  The party seeking to invoke the doctrine of issue preclusion must establish that (1) the issue previously decided is identical to the one presented in the action in question; (2) the prior action has been fully adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.  Id.

In this case, there is no identity of issues.  The issue before the Bankruptcy Court was the effect of the BLM's decision to declare the Clod Buster mine abandoned and void.  By contrast, the issue before the IBLA in 2004 was whether Taylor was entitled to file a NOITL on withdrawn lands, which lands were different from the Clod Buster site.  Compare Bankruptcy Court's Findings and Conclusions and Doc. 19; Exh. 22 at 1.  Moreover, the Bankruptcy Court could not have considered the issue of withdrawn lands because Public Land Order 7392, which withdrew the lands for which Taylor was attempting to file his NOITLs, was not enacted until 1999.  See 64 FR 28832 (May 27, 1999).  Collateral estoppel is inapplicable where both the facts (Clod Buster vs. non-Clod Buster lands) and the law (pre-Public Land Order 7392 vs. post-Public Land Order 7392) in the second action "are

-20-

substantially different from those" in the earlier action. Cmty. Hosp. v. Sullivan, 986 F.2d

357, 360 (10th Cir. 1993) (*citing* Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591,

599-601 (1948) (collateral estoppel "must be confined to situations where the matter raised

in the second suit is identical in all respects with that decided in the first proceeding and

where the controlling facts and applicable legal rules remain unchanged.")).

A side from arguing that the NOITL lands were improperly withdrawn in light of the

Bankruptcy Court's Findings and Conclusions and, therefore, the IBLA's October 29, 2004

decision of the IBLA was arbitrary and capricious, Taylor makes no further argument in

support of his position that these lands were improperly withdrawn. He makes, for example,

no argument that the withdrawal was procedurally improper. To the contrary, Taylor has

included as an exhibit a letter to him from the BLM dated October 27, 1995, to which the

BLM had attached a *Notice of Proposed Withdrawal and Opportunity for Public Meeting:*

*New Mexico.* [Doc. 1; Exh. 19]. The letter explained that the BLM intended to withdraw

certain lands to protect an area having a high potential for the development of humate, and

that some of Taylor's mining claims were included within those lands. Accordingly, the

letter advised Taylor of a comment period, as well as the person to whom to send requests

for a public meeting. The letter also advised that at the end of a 2-year period during which

the *Notice* would be published in the Federal Register, a decision would be made whether

to withdraw the proposed lands for a 20-year period.

Thereafter, on May 27, 1999, the lands were withdrawn pursuant to Public Land Order 7392. The Secretary of the Interior is authorized to withdraw lands under the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714 (1994). See 43 U.S.C. § 1714(a). "[T]he proper action to take when the mineral estate covered by a notice of intent to locate is unavailable for mineral entry is to reject the notice . . . ." Nat'l Cement Co. of California, 156 IBLA 131, 135 (2001). The October 29, 2004 decision of the IBLA was not arbitrary and capricious.

## 2. The July 26, 2005 Decision of the IBLA

On October 12, 2005, Taylor filed a *Motion to Take Leave to File Amendment to Complaint*, seeking to amend his *Final Amended Complaint* so as to be able to appeal a July 26, 2005 decision of the IBLA. [See Doc. 63]. That decision affirmed a decision of the BLM declaring null and void *ab initio* association place mining claims (the Revenge claims) that Taylor attempted to locate on withdrawn lands. As with the NOITL lands that were the subject of the IBLA's October 29, 2004 decision, the Revenge I, II, and III claims also were determined to be located on land withdrawn by Public Land Order 7392, while the minerals associated with the Revenge IV claim were deemed void *ab initio* for other reasons.[13] [Id.; Exh. 27].

_____

[13] The IBLA explained that the Revenge IV claim was situated on land conveyed in 1944 to the heirs of Ush-kath-de-tsa, a Navajo Indian. The IBLA then determined that minerals associated with the Revenge IV claim would either have transferred to the heirs of Ush-kath-de-tsa or would have been allotted to those heirs in trust, and that "[e]ither scenario render[ed] the location of the Revenge IV claim null and void ab initio." [Doc. 63; Exh. 27 at 5-6].

-22-

Under the present circumstances, Taylor may amend the *Final Amended Complaint*

"only by leave of court or by written consent of the adverse party . . . ." Fed.R.Civ.P. 15(a).

Neither adverse party has provided written consent to Taylor's request for leave to amend.

Thus, the decision to allow leave to amend is within the discretion of the Court, which may

deny such leave for a qualifying reasons such as undue delay, bad faith or dilatory motive

on the Taylor's part, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment,

or futility of amendment. See Foman v. Davis, 371 U.S. 178, 182 (1962); accord Hom v.

Squire, 81 F.3d 969, 973 (10th Cir. 1996). This Court determines that such an amendment

would be futile.

A motion to amend a complaint is futile if, notwithstanding the amendment, the

complaint "would be subject to dismissal" for any reason. Jefferson County Sch. Dist. No.

R-1 v. Moody's Investor's Servs., Inc., 175 F.3d 848, 859 (10th Cir. 1999). Thus, an

amendment is futile if the resulting pleading would not survive a motion to dismiss under

Fed.R.Civ.P. 12(b)(6), *i.e.*, if "'it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief.'" GFF Corp. v. Associated

Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (*quoting* Conley v. Gibson,

355 U.S. 41, 45-46 (1957)). An amendment also is futile of it can be determined on the

basis of undisputed material facts that the resulting pleading would not survive a motion for

summary judgment under Fed.R.Civ.P. 56. See Watson v. Beckel, 242 F.3d 1237, 1239-40 (10th Cir. 1997).

In this case, the Court concludes that the proposed amendment would be futile, given that the Revenge claims were declared void "on the basis that they were located on lands not open to location at the time of the location." [Doc. 63; Exh. 27 at 1]. Indeed, Revenge I, II, and III were located on lands withdrawn by Public Land Order 7392, the same Order that withdrew the lands on which Taylor had attempted to file his NOITLs discussed above. [See Doc. 63; Exh. 27]. For this reason, Taylor's *Motion to Take Leave to File Amendment to Complaint* will be denied.

### B. Taylor's Action Vis-à-Vis the State Defendants

Taylor has asserted claims against the State Defendants pursuant to 42 U.S.C. § 1983. [See Doc. 41 at 2]. He argues that State Defendants issued a cessation order signed by Defendant Doug Bland,[14] requiring all mining at the Clod Buster site to come to a halt because Agronics had failed to secure the proper permits. [Id. at 11]. The cessation order states that it was issued under the authority of the New Mexico Mining Act. [Doc. 1; Exh. 15]. According to Taylor, Agronics's failure to secure the proper permits was a result of State Defendants' reliance on decisions made by the BLM between 1992 and 2003. [Doc. 41 at 11]. Taylor does not dispute that he failed to follow the permitting process; rather, he appears to contend that the BLM, though its decisions and actions, made compliance

---

[14] The copy of the cessation order submitted to the Court by Taylor does not appear to bear any signature or otherwise indicate who was responsible for issuing the order. [See Doc. 1; Exh. 15].

impossible. [See Doc. 48 at 8]. Taylor appears to argue that State Defendants' actions in

relying on the BLM amounted to a violation of his rights to procedural and substantive due

process. [See id. at 14; see also Doc. 48 at 9 ("Plaintiff's 4th, 5th and 14th amendment due

process, protection from unreasonable seizure has been denied by the structure of the multi-

agency approval and concurrence process . . . .").

    The State Defendants have moved to dismiss the *Final Amended Complaint* pursuant

to, *inter alia*, Fed.R.Civ.P. 12(b)(6). [See Docs. 42, 43]. Dismissal of a complaint under

Fed.R.Civ.P. 12(b)(6) is appropriate only if "'it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief.'" GFF Corp.,

130 F.3d 1 at 1384 (*quoting* Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "The court's

function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might

present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to

state a claim for which relief may be granted." Miller v. Glanz, 948 F.2d 1562, 1565 (10th

Cir.1991). Accordingly, all well-pleaded factual allegations in the complaint are accepted

as true and viewed in the light most favorable to the nonmoving party. GFF Corp., 130 F.3d

at 1384.

    "In addition to the complaint, the . . . court may consider documents referred to in the

complaint if the documents are central to the plaintiff's claim and the parties do not dispute

the documents' authenticity." Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir.

2002). Thus, "if a plaintiff does not incorporate by reference or attach a document to its

complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." GFF Corp., 130 F.3d at 1384. The Court "'may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment." Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994).

Among the bases for dismissal asserted by Defendants Bland and Brancard, the individual State Defendants, is that they are entitled to qualified immunity. [Doc. 43 at 9-10]. "Under the doctrine of qualified immunity, government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Douglas v. Dobbs, 419 F.3d 1097, 1100 (10th Cir.2005) (quotation omitted). When a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to immunity. Robbins v. Wilkie, 433 F.3d 755, 764 (10th Cir. 2006) (citing Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir.2001)). To overcome a qualified immunity defense, a plaintiff must first assert a violation of a constitutional or statutory right and then show that the right was clearly established. Robbins, 433 F.3d at 764. A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). To show that a right is clearly established, a plaintiff does not have to produce a factually identical case.

Rather, he plaintiff may produce a Supreme Court or Tenth Circuit opinion on point, or demonstrate that the right is supported by the weight of authority from other courts. Robbins, 433 F.3d at 764. Once the plaintiff satisfies this initial two-part burden, the burden shifts to the defendant to show that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. Id.

The only potentially applicable constitutional or statutory right identified by Taylor is a right under the Mining Law of 1872, 30 U.S.C. §§ 21 *et seq.*, to have humate treated as a locatable mineral. [See Doc. 48 at 6 ("The following laws . . . have been issued which form a basis for 'clearly established law' for the treatment of locatable minerals and humate as a locatable mineral in specific: 1: The Mining Law of 1872, 30 U.S.C. §§ 21 *et seq.*"). Assuming without deciding that federal mining laws create a right to have humate treated as locatable, Taylor has not demonstrated how State Defendants' actions in issuing a cessation order under the authority of the New Mexico Mining Act was a violation of a clearly established right or that the contours of the right were sufficiently clear that a reasonable official would have understand that what he was doing violated that right. See Anderson, 483 U.S. at 640. It is Taylor's burden to produce a Supreme Court or Tenth Circuit opinion on point, or demonstrate that the right he asserts is supported by the weight of authority from other courts. See Robbins, 433 F.3d at 764. He has not done so. For this reason, the Court concludes that Defendants Bland and Brancard, to the extent they have been sued in their individual capacities, are entitled to qualified immunity.

-27-

This determination, however, does not dispose completely of Taylor's claims against the State Defendants, as Bland and Brancard have also been sued in their official capacities. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Whereas, on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right, more is required in an official-capacity action as a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation.  Id. (internal quotations and citations omitted).  "[T]hus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law."  Id. (quoting Monell v. New York City Dep't. of Social Services, 436 U.S. 658, 694 (1978).  In this case, Taylor has not alleged or identified a policy or custom of the MMD, much less shown how such a policy or custom played a part in the violation of federal law.  See Monell, 436 U.S. at 694 (explaining that governmental entity cannot be held liable under theory of *respondeat superior* and that it is only when execution of a governmental policy or custom inflicts injury that the government as an entity is responsible under § 1983).  For these reasons, State Defendants' motion to dismiss for failure to state a claim will be granted.

-28-

## III. CONCLUSION

For the foregoing reasons, the Court grants the *State Defendants' Motion to Dismiss with Prejudice Plaintiff's Final Amended Complaint for Declaratory Judgment, Appeal from the IBLA, Petition for Habeas Corpus and Other Claims*; denies the *United States' Motion to Dismiss Plaintiff's Final Amended Complaint Due to Lack of Subject Matter Jurisdiction*; and denies Plaintiff's *Motion to Take Leave to File Amendment to Complaint.*

**IT IS, THEREFORE, ORDERED** that the *State Defendants' Motion to Dismiss with Prejudice Plaintiff's Final Amended Complaint for Declaratory Judgment, Appeal from the IBLA, Petition for Habeas Corpus and Other Claims* [Doc. 42] is **GRANTED**;

**IT IS FURTHER ORDERED** that the *United States' Motion to Dismiss Plaintiff's Final Amended Complaint Due to Lack of Subject Matter Jurisdiction* [Doc. 46] is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's *Motion to Take Leave to File Amendment to Complaint* [Doc. 63] is **DENIED**.

**SO ORDERED** this 30th day of June, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge



UNITED STATES BANKRUPTCY COURT
STATE OF NEW MEXICO

In re
AGRONICS, INC.,

        Debtor.                         No. 11-94-12819 MA

## FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

THIS MATTER came before the Court upon the debtor's objection to the claim of the United States Department of Interior, Bureau of Land Management (BLM) and upon the debtor's motion to declare an action of the BLM void and to reinstate certain mining claims.  Having heard the arguments of counsel, examined the pleadings and briefs, and being otherwise fully advised, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1.  Agronics, Inc., (Agronics) is in the business of mining and marketing humate as a soil conditioner, animal feed supplement, and for purposes of odor control.

2.  Leland T. Taylor is the president of Agronics.

3.  In July 1976, Leland B. Taylor (father of Leland T. Taylor) was issued a Material Sale Contract by the BLM, under the authority of the Materials Act of 1947, to mine humate within certain private land more particularly described as

the Northwest 1/4 of Section 9, Township 19 North, Range 1 West, NMPM (the "mining area" or the "Clod Buster mine").

4. The mining area is private surface, patented under the Stockraising Homestead Act of 1916, with coal and other minerals reserved to the United States. The surface estate to the mining area is owned by Charles Barboa.

5. Pursuant to the Mineral Sale Contract, Agronics mined humate from 1976 until August 29, 1992, when the contract was canceled by the BLM.

6. On May 29, 1993, Leland B. Taylor, Leland T. Taylor, Daniel Boardman, John Kelly, Edward Groves, John Benavidez, Patrick Tompkins, and Celeste Taylor-Ryman (the mineral claimants) filed notice of location of approximately 160 acres of placer mining land to be known as Celestial Productions 2. The land and claim described in the notice of location is the Clod Buster mine.

7. During the period between the cancellation of the contract and the filing of the notice of discovery by location, Agronics continued to extract humate from the mining area. According to the BLM, the extractions of humate during this period constituted trespass.

8. On October 25, 1994, Agronics filed for relief under Chapter 11 of the Bankruptcy Code.

9. On December 9, 1994, the BLM filed a proof of claim for $136,392.00 for damages resulting from the alleged trespass. The proof of claim was amended to $22,893.00 on August 13, 1996.

2

10. On October 17, 1995, the New Mexico office of the BLM issued a decision declaring the debtor's mining claims to be abandoned and void. According to the letter to Agronics announcing the decision, an annual maintenance fee of $100.00 per claim is due annually on or before August 31 for the subsequent assessment year beginning at 12 o'clock noon on September 1 of that year. Agronics' maintenance fee was received on September 6, 1995. The BLM based the decision to declare the mines abandoned and void on 43 CFR 3833.1-5, which provides that failure to conform to the requirements of the regulation constitutes a forfeiture of the mining claim. The BLM letter makes reference to the possibility of an appeal of the decision.

11. At the time the BLM declared the mining claims to be abandoned and void, the BLM had notice of the fact that Agronics had filed a petition in bankruptcy.

12. The Clod Buster mine is located in the Upper Cretaceous system of the Menefee Formation. The humate deposit is composed of black-brown laminated carbonaceous shaley siltstone with plant fragments and/or powdery black shale.

13. Humate is a naturally formed carbonaceous substance having a limited but definable range of chemical composition.

14. Humate is considered to be a mineral by the U.S. Geological survey, in the sense the word "mineral" is used in broad geological or mining contexts.

3

Humate is not created *de novo* by organisms and results only from decomposition of such organisms or natural derivation from carbonaceous substances of whatever origin.

15. Witness Leland T. Taylor testified that humate has no structural integrity, decomposes spontaneously, and cannot accurately be characterized as stone.

16. Witness Larry L. Barton testified that humate can be characterized as a flaky brown substance, but not as stone.

17. Witness Bob McCaslin testified that he does not know if humate is properly characterized as stone.

18. The humate deposit has never been used or sold by Agronics for building material.

19. Agronics mined, bagged and sold the humate under the name "Clod Buster."

20. Agronics extracted, removed, and marketed humate at a profit.

21. For each of the four years 1989-1991 and 1993, Agronics earned an annual operating profit greater than $45,000.00 from humate. In 1992 Agronics sustained an operating loss because of an extraordinary loss item.

22. A reasonable likelihood exists that Agronics can continue to extract, remove and market humate at a profit in the future.

23. Access to the mining area is via Highway 44 to old Highway 44, north

4

four miles to a light duty road across patented land to the Clod Buster site.

24. Highway 44 is the main highway between Albuquerque and Farmington. The Clod Buster mine is approximately 75 miles from Albuquerque, a rail and highway transportation hub.

25. The composition of the humate on the Clod Buster mine has a low pH and an inherent chemical activity when applied to soil. The low pH and the chemical activity of humate changes the chemistry of the soil in such as way as to promote plant growth, root growth and growth of certain soil microorganisms.

26. The BLM acknowledges that published test results indicate humate reacts chemically with soil and increases plant productivity to a limited extent.

27. On May 19, 1989, the United States evaluated certain humate mining claims in Utah (the Clawson claims). The United States issued a patent on Clawson claims Nos. 1 & 2 based on a mineral report for patent application prepared by the Forest Service.

28. The Forest Service, in preparing its report, relied on an independent analysis of the humate on the Clawson claims which was done by Native Plants, Inc. (NPI).

29. NPI's analysis showed that three properties of the carbonaceous shale would influence chemical changes in alkali soils.

30. The Forest Service soil scientist generally agreed with NPI's conclusions

5

based on laboratory results.

31. The physical and chemical properties of the Clod Buster humate deposit are markedly similar to the physical and chemical properties of the Clawson claims as reported in the Forest Service report.

## CONCLUSIONS OF LAW

32. Whatever is recognized as a mineral by the standard authorities, whether metallic or other substance, when found in public lands in quantity and quality sufficient to render the lands valuable on account thereof, is treated as coming within the purview of the mining laws.  43 CFR Chapter 11 §3812.

33. Humate is a mineral within the purview of the mining laws.

34. Certain minerals are subject to the Multiple Surface Use Act which was passed by Congress on July 23, 1955. Section 3 of this statute is referred to as the "Common Varieties Act" and provides:

> No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws: *Provided, however* That nothing shall affect the validity of any mining location based upon discovery of some other mineral occurring in or in association with such a deposit. 'Common varieties' as used in sections 601, 603, and 611 to 615 of this title [Title 30] does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value and does not include so-called

6

"block pumice" which occurs in nature in pieces having
one dimension of two inches or more.

35. The Common Varieties Act does not apply to common varieties of all

minerals but only to common varieties of those minerals named. U.S. v. Kaycee

Bentonite Corp. et al., 89 Interior Dec. 262, 64 IBLA 186 (1982); U.S. v. Beal, 23 IBLA

378 (1976); Maley, American Law of Mining, §8.01[4](a)(i).

36. Humate is not a mineral named in the Common Varieties Act and

does not fall within the category of "stone" within the meaning of the Act.

37. The Common Varieties Act does not govern the locatability of the

humate deposit at the Clod Buster mine.

38. The General Mining Law of 1872, as amended, reads in pertinent part

as follows:

> [Except as otherwise provided,] all valuable mineral deposits in
> lands belonging to the United States, both surveyed and unsurveyed, are
> hereby declared to be free and open to exploration and purchase, and
> the land in which they are found to occupation and purchase, by citizens
> of the United States and those who have declared their intention to
> become such, under regulations prescribed by law, and according to the
> local customs or rules of miners in the several mining-districts, so far as the
> same are applicable and not inconsistent with the laws of the United
> States. 30 USCS §22

39. The locatability of humate should be determined according to the

General Mining Law of 1872.

40. A mineral is not non-locatable merely because it is used for

agricultural purposes. U.S. v. Bunkowski, 79 Interior Dec. 43 (1972).

7

41. The test for locatability of a mineral used as a soil conditioner is that the mineral, in order to be classified as a locatable mineral, must change the chemical environment of the plant to make nutrient materials more available to the plant, although not necessarily supplying those materials to the plant. U.S. v. Bunkowski, 79 Interior Dec. 43 (1972); United States v. Robinson, 21 IBLA 363, 387 (1975); U.S. v. Beal, 23 IBLA 378 (1976); U.S. v. Robert A. Rukke, 32 IBLA 155 (1977).

42. Humate from the Clod Buster mine changes the chemical environment of soil in a manner which satisfies the requirements of the Bunkowski test for locatability.

43. Based on evidence of the accessibility of the Clod Buster mine and the past profitability of the sale of the Clod Buster humate, the Court concludes that humate from the Clod Buster mine is a valuable mineral.

44. Although the patent issued with respect to the Clawson claims does not bind this Court to determine that the Clod Buster humate is locatable, the issuance of the patent and the contents of the Forest Service report substantiate such a finding.

45. The humate deposit at the Clod Buster mine satisfies the statutory and common law requirements for locatability.

46. Because humate is a locatable mineral, the debtor's severance and removal of humate from the Clod Buster mine between August, 1992, and May,

8

1993, did not constitute trespass. The claim of the BLM for damages resulting from trespass should be disallowed.

47. The action of the BLM in declaring the Clod Buster mining claims to be abandoned and void was in violation of §362(a)(3) of the Bankruptcy Code, which provides that the automatic stay bars any act to obtain possession of or to exercise control over property of the estate.

48. Although §362(b)(4) of the Bankruptcy Code provides an exception to the automatic stay for actions by governmental units seeking to enforce police or regulatory power, the exception does not apply to actions pursued to advance the pecuniary interest of the governmental unit. Matter of Universal Life Church, Inc., 191 B.R. 433 (Bankr. E.D. Cal. 1995); In re Christensen, 167 B.R. 213 (Bankr. D. OR 1994).

49. The congressional intent of the police and regulatory power exception to the automatic stay is to permit governmental units to avoid restrictions when necessary to protect public health and safety. In re USAfrica Airways Holdings, Inc., 192 B.R. 641 (Bankr. D. Del. 1996); In re Herrera, 194 B.R. 178 (Bankr. N.D. Ill. 1996).

50. In the context of the exception to the automatic stay, "police and regulatory power" is to be construed narrowly. In re Lazar, 200 B.R. 358 (Bankr. C.D. Cal. 1996).

51. The BLM did not declare the Clod Buster mining claims to be

9

abandoned and void in order to protect public health and safety but in

conjunction with a pecuniary interest of the Bureau.

52. The debtor's motion to declare the action of the BLM void should be

granted, and those Clod Buster mining claims which were declared abandoned

and void by the BLM should be reinstated.

Appropriate orders will be entered.

_____

MARK B. McFEELEY
United States Bankruptcy Judge


I certify that on the above stamped date I mailed a copy of the above to:


Mr. Stephen Charnas
Attorney at Law
PO Box 1945
Albuquerque, NM 87103

Mr. Manuel Lucero
Attorney at Law
PO Box 607
Albuquerque, NM 87103-0607
766-3342 Ext.142

Mr. Gary B. Ottinger
Attorney at Law
PO Box 1782
Albuquerque, NM 87103-1782
(505) 246-8699

10

Mr. Leonard K. Martinez-Metzgar, Attorney
Office of the United States Trustee
PO Box 608
Albuquerque, NM  87103-0608

Dinah N. Martinez
Secretary to Judge McFeeley
(505) 248-6526

11

**FILED**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

at_____ o'clock ____ M

JUN 2 6 1998

United States Bankruptcy Court
Albuquerque, New Mexico

In re:

**AGRONICS, INC.,**

　　　　　　　　**Debtor in Possession.**　　　　　　　　　**No. 11-94-12819 MA**

### SUPPLEMENTAL FINDINGS OF FACT
### AND CONCLUSIONS OF LAW ON REMAND

*THIS MATTER* came before the Court upon the April 26, 1998 Order of the District

Court for the District of New Mexico ("District Court Order"), in the appeal of this Court's

Order Declaring an Action of the Bureau of Land Management Void and Reinstating Mining

Claims and Order Sustaining Debtor's Objection to the Claim of the Bureau of Land

Management. The District Court Order remands the case to the Bankruptcy Court for additional

findings of fact and conclusions of law on: (a) Appellee-Debtor's standing to raise the issue of

locatability before the Bankruptcy Judge as a defense to the Bureau of Land Management's

("BLM") Proof of Claim for Trespass, and (b) the Bankruptcy Court's jurisdiction under 28

U.S.C. §157 to hear issues regarding the BLM's trespass and abandonment claims. The Court,

having reviewed the record in this case, makes the following additional findings of fact and

conclusions of law:

### FINDINGS OF FACT

　　　1.　　　On October 24, 1994, the Debtor Agronics, Inc., filed for relief under chapter 11

of the Bankruptcy Code.



2.      Agronics became a debtor-in-possession upon the filing of the bankruptcy petition and was the debtor-in-possession at the time of hearing on this matter.

3.      On December 9, 1994, the BLM filed a proof of claim in this bankruptcy case for trespass based upon the Debtor's removal of mineral materials which the BLM asserts are reserved to the United States (the "trespass claim"). The BLM amended its trespass claim on August 13, 1996.

4.      On October 17, 1995, the BLM gave notice to the Debtor of the BLM's determination that the Debtor had abandoned its mining claim and that the Debtor's mining claims were void (the "abandonment claim").

5.      On November 17, 1995, the Debtor filed an objection to the BLM's claim, raising the issue of locatability in its objection.

6.      On December 15, 1995, the BLM responded to Debtor's objection to claim, countering on the issue of locatability and supporting its claim by asserting that Debtor's mining claims were abandoned and void.

7.      On February 12, 1996, the Debtor filed a motion seeking a declaration that the action of the BLM, in declaring that the Debtor's mining claims had been abandoned and were void, was void and seeking a reinstatement of those mining claims ("motion regarding mining claims"). The substance of the Debtor's motion was to seek relief from the BLM's violation of the automatic stay under 11 U.S.C. §362.

8.      On March 4, 1996, the BLM responded to the Debtor's motion, again raising the issue of locatability.

2

9.      The Court held a trial on the merits of the BLM's claim, the Debtor's claim objection and the Debtor's motion regarding mining claims on September 25 and 26, 1996.

10.     In order for this Court to determine whether the BLM had violated the automatic stay and the debtor was entitled to relief in accordance with its motion regarding mining claims, and to determine whether the BLM's claim was valid, the Bankruptcy Court was required to determine the underlying issues of trespass, abandonment and locatability.

11.     The BLM did not request any findings of fact or conclusions of law about the Debtor's standing to assert locatability as a defense to the BLM's proof of claim or this Court's jurisdiction under 11 U.S.C. §157(b) to consider the BLM's trespass and abandonment claims.

12.     Following the pre-trial conference held on August 13, 1995, the Court entered a stipulated pre-trial order on the Debtor's objection to claim. The Pre-Trial Order did not identify the debtor's standing to assert locatability as an issue, and expressly stated that "[j]urisdiction over the subject matter and the parties is not contested, and is hereby found to be present under 28 U.S.C. §157(b)(2)(B), as a core proceeding."

13.     The BLM raised standing as an issue for the first time at trial on the merits.

## CONCLUSIONS OF LAW

1.      This Court's determination of the motion regarding mining claims is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(b)(2)(A), (G) and (O).

2.      This Court's determination of the BLM's proof of claim and the Debtor's objection thereto, including consideration of the issue of locatability, is a core proceeding over

3

which this Court has jurisdiction pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(b)(2)(B) and (C).

    3.     The Debtor has standing to raise the issue of locatability before this Court as a defense to the BLM's trespass claim.

_____
**MARK B. MCFEELEY**
**U.S. BANKRUPTCY JUDGE**

I certify that on the date stamped above I mailed a copy of these Supplemental Findings of Fact and Conclusions of Law on Remand  to:

    Michael K. Daniels, Esq.
    P.O. Box 1640
    Albuquerque, NM  87103

    Manuel Lucero
    Assistant U.S. Attorney
    P.O. Box 607
    Albuquerque, NM  87103

_____
Elizabeth Lucero
Courtroom Deputy to Judge McFeeley
(505) 248-6526

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Appellant,

vs.                                        No. CIV 97-590 JP/JHG

AGRONICS, INC.,

     Appellee.

## **ORDER**

On March 25, 1997, the United States Bankruptcy Court entered an Order Declaring an Action of the Bureau of Land Management Void and Reinstating Mining Claims (Doc. No. 208 in bankruptcy proceeding) and an Order Sustaining Debtor's Objection to the Claim of the Bureau of Land Management (Doc No. 207 in bankruptcy proceeding). On April 28, 1997, the United States of America appealed these orders to the District Court.

On April 26, 1998, I entered an Order (Doc. No. 19) remanding the case to Bankruptcy Court for additional findings on the issues of jurisdiction and standing after noting that "Appellant's objections appear to be without merit."

On June 26, 1998, the Bankruptcy Court entered Supplemental Findings of Fact and Conclusions of Law on Remand (Doc. No. 20).

I have made a *de novo* review of the Bankruptcy Judge's Findings of Fact and Conclusions of Law as well as the Bankruptcy Judge's Supplemental Findings of Fact and Conclusions of Law. I determine that the Appellant's Objections are without merit, that the Orders of the Bankruptcy Judge filed March 25, 1997 should be affirmed, and that this appeal should be dismissed.

IT IS THEREFORE ORDERED THAT:

.1.     The United States Bankruptcy Judge's Order Declaring an Action of the Bureau of
Land Management Void and Reinstating Mining Claims is affirmed; and

2.     The United States Bankruptcy Judge's Order Sustaining Debtor's Objection to the
Claim of the Bureau of Land Management is affirmed; and

3.     This appeal is dismissed.

_____
UNITED STATES DISTRICT JUDGE

2